**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SUNDAY UWUMAROGIE, individually and as the Special Administrator of the Estate of BENJAMIN UWUMAROGIE, deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 06 C 2628 |
| THE VILLAGE OF GLEN ELLYN, a municipal corporation, JASON BRADLEY, and UNKNOWN POLICE OFFICERS, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Sunday Uwumarogie, acting on behalf on himself and the estate of his late son, Benjamin Uwumarogie ("Benjamin"), has sued the Village of Glen Ellyn, Glen Ellyn police officer Jason Bradley, and other unknown police officers, alleging that they violated Benjamin's federal constitutional rights and violated his family's rights under Illinois law. The Village and Bradley have moved for summary judgment, and for the following reasons, the Court grants the motion in part and denies it in part.

### Facts

This case involves Bradley's fatal shooting of Benjamin on April 26, 2006 during a response to a domestic violence call. Because defendants have moved for summary judgment, the Court views the facts in the light most favorable to plaintiff and draws

reasonable inferences in his favor.  *See, e.g., DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987).

On the evening of April 26, 2006, Benjamin's girlfriend placed a 911 call to report domestic violence in progress at the Iron Gate Apartments in Glen Ellyn, Illinois.  The police dispatch recording from that day indicates that the caller told the dispatcher that Benjamin was hurting a baby.  Two police officers were assigned to the call; Bradley arrived at the apartment complex first, approximately two minutes after the call went out.  Bradley says that he found the subject—Benjamin—standing naked and unarmed in the courtyard.  Bradley approached Benjamin, attempted unsuccessfully to grab and arrest him, and discharged pepper spray into Benjamin's face.  Bradley says that Benjamin told Bradley that he was going to have to do better than that in order to stop him.  Benjamin then entered a ground-floor apartment.  From the door of the apartment, Bradley saw a heavy-set man and a baby (later identified as Benjamin's son) standing against the wall near the door.  Seeing Benjamin pick up the baby and run toward the back of the apartment, Bradley followed.  He reported to dispatch that Benjamin had picked up a child and that he needed back-up.

What happened next is disputed.  Bradley contends that Benjamin slipped and fell outside of the apartment's bathroom, dropping the baby in the process.  Benjamin then picked up the child and took it into the bathroom.  Bradley followed them into the bathroom where he saw the two of them in a full bathtub.  Bradley says that Benjamin was holding the baby under the surface of the water and indeed, approximately twenty seconds after he reported that Benjamin had picked up the child, he reported over his radio to dispatch, "He's trying to drown the kid."  *See* Pl. Resp. to Def. LR 56.1 St., Ex.

F at 8:2.  Plaintiff denies that Benjamin was trying to drown his son in the bathtub and

suggests that Benjamin was instead washing pepper spray out of his son's eyes.[1]

Bradley says he told Benjamin to let go of the baby and in an attempt to get him

to do so, struck Benjamin with his closed fist and forearms in the back of the neck and

kidneys.  While water overflowed from the tub, Bradley continued striking and yelling at

Benjamin.  According to Bradley, Benjamin started swinging his arm to hit back at him.

By stepping into the tub with one leg for leverage, however, Bradley was able to pull the

baby out of the tub.  He says that Benjamin continued to strike at him from the bathtub,

hitting him in the face, neck and chest.

At that point, Bradley says, he turned and saw the heavy-set man standing in the

doorway of the bathroom.  He asked the man—who has not been further identified by

either party—for help.  The man eventually responded by pulling Bradley away from the

tub by tugging at the back of his shirt and bullet-proof vest, a maneuver that made

Bradley unsure of the man's intentions.  When Bradley asked the man to take the baby

outside to the waiting paramedics, however, he complied.  With the baby gone, Bradley,

who was still kneeling outside of the tub, was able to put his arms around Benjamin,

restrain his hands, and radio to dispatch that he had the subject but was unable to

handcuff him.  Slightly less than a minute had passed since his earlier dispatch

---

[1]  Because Benjamin is dead, plaintiff cannot ground this suggestion in personal
knowledge, as is required by Rule 56.  Deputy Chief of Police William Holmer testified
at his deposition, however, that he could smell pepper spray in the air in the apartment
when he arrived on the scene.  That provides some support for plaintiff's proposed
inference.  In addition, as discussed below, Bradley's credibility is a matter of genuine
dispute.  As a result, Benjamin's actual intent when he had the baby in the bathtub is
genuinely disputed on the present record.  Def. 56.1 St., Ex. B, 45:4-9.

reporting that Benjamin was trying to drown the baby.

Forty seconds later—approximately fifteen seconds after backup officers had arrived but were unable to locate Bradley and Benjamin, the dispatch tape records Bradley reporting that shots had been fired. Bradley offers the following account of those forty seconds. First, because Benjamin briefly calmed down, Bradley intended to hold on to him and wait for assistance to help him take Benjamin into custody. Moments later, however, Benjamin threw his head back, striking Bradley in the nose. When Bradley turned his head to the side to avoid being struck again, Benjamin threw his head back for the second time, this time hitting the right side of Bradley's face. The third time Benjamin threw his head back, Bradley successfully avoided him, but in the process, he lost his grip on Benjamin. Benjamin then stood up and struck Bradley, who was still kneeling, in the face. Bradley stood up and punched Benjamin in the face twice. Benjamin responded with a flurry of punches as he got out of the bathtub, making what Bradley characterized as Bruce Lee noises. Bradley backed away with his hands up to guard his face, unable to return any punches. As he backed out of the bathroom, he stumbled, successfully bracing himself against the wall to keep from falling. With his hands down to brace himself, Bradley says he was struck in the face by several of Benjamin's punches.

Bradley says he backed away from Benjamin towards the bedroom of the apartment, struck his head on the door frame, and stumbled into the bedroom. As Benjamin continued to follow him, Bradley backed into the bed and fell into a seated position on the bed. He says he was able to scoot backwards into the middle of the bed before Benjamin jumped on top of him and straddled him. Unable to move under

4

Benjamin's weight, Bradley then says he received many blows to the head, causing him to see white lights and stars and his vision to blur and blacken. Bradley also testified that he covered his face with his hands and pulled his elbows down towards his belt to protect his gun. When he felt that he was losing consciousness and could not escape from Benjamin's blows, Bradley pulled his gun from his holster. As Benjamin began to choke him with one hand and to punch him with the other, Bradley pulled the trigger, striking Benjamin in the face. Benjamin fell on top of him.

Bradley rolled Benjamin off of him, got off the bed, and pointed his gun at him again. After a few seconds, he realized that Benjamin was not moving and heard a gurgling sound. Bradley then scanned the room to see if anyone else was around, reloaded his pistol, and checked Benjamin for a pulse. He found none and administered no first aid to Benjamin. The paramedics, who had been staged outside, began to enter the room, and Bradley left the apartment to get into an ambulance. A coroner pronounced Benjamin dead that evening, finding, after an autopsy, that he had died instantly of a gunshot wound to the head.

Plaintiff's complaint includes six claims, two of which (counts three and four) he has withdrawn. The first one is a claim under 42 U.S.C. § 1983; Plaintiff alleges that Bradley violated Benjamin's rights under the Fourteenth Amendment to the Constitution. Compl. ¶¶ 10-16. Count two is a *Monell* claim against the Village. *Id.* ¶¶ 17-24. In count five, plaintiff advances a claim against all defendants under the Illinois Wrongful Death Act, 740 ILCS 180/1-2. Compl. ¶¶ 39-43. Finally, count six is a claim against the Village under the Tort Immunity Act, 745 ILCS 10/2-207 & 1-210. Compl. ¶¶ 44-47.

**Discussion**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine whether a genuine issue of material fact exists, the Court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

1.      **Excessive force (count 1)**

Plaintiff's excessive force claim under 42 U.S.C. § 1983 is based on Bradley's alleged violation of Benjamin's Fourth Amendment right to be free from unreasonable seizure. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that a police officer's use of force during an arrest or other seizure is analyzed under the Fourth Amendment's prohibition against unreasonable seizures). "A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).

"[I]t is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.'" *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam)

(quoting *Garner*, 471 U.S. at 11). Bradley claims, however, to have shot Benjamin in self-defense, thus implicating the rule that "'when an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.'" *Muhammed*, 316 F.3d at 683 (quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) and omitting emphasis). The Court's inquiry focuses on "whether the officer's decision to use deadly force was *objectively* reasonable." *Maravilla v. United States*, 60 F.3d 1230, 1233 (7th Cir. 1995) (emphasis in original). Whether Bradley acted reasonably in shooting Benjamin must be determined "in light of the facts and circumstances confronting [him] at the moment [he] acted." *Maravilla v. United States*, 60 F.3d 1230, 1233 (citing *Graham*, 490 U.S. at 397). In addition, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Bradley asserts that Benjamin's attack on him in the bedroom justified his use of deadly force. More specifically, he contends that he knew Benjamin was violent based on the original call from dispatch; Benjamin's irrational behavior at the scene; his statement, after being pepper sprayed, that Bradley would have to do more to stop him; Benjamin's attempt to drown a baby; and his violent attack just before Bradley shot him. Bradley contends that the circumstances of that attack placed him in imminent danger of serious bodily injury or worse.

A jury that believed Bradley's account almost certainly would find that his use of deadly force was objectively reasonable. Plaintiff provides no eyewitness testimony to

rebut Bradley's account.  That, however, is unsurprising given that Bradley alone

survived the encounter between him and Benjamin.  The Seventh Circuit has cautioned

that "[t]he award of summary judgment to the defense in deadly force cases may be

made only with particular care where the officer defendant is the only witness left alive

to testify."  *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994).  Because a defendant

in a self-defense case "knows that the only person likely to contradict him or her is

beyond reach. . . a court must undertake a fairly critical assessment of the forensic

evidence, the officer's original reports or statements and the opinions of experts to

decide whether the officer's testimony could reasonably be rejected at trial."  *Id; see

also Maravilla*, 60 F.3d at 1233-34 ("In these situations we think it wise to examine all

the evidence to determine whether the officers' story is consistent with other known

facts.").  *See generally Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005)

(because Fourth Amendment reasonableness inquiry "nearly always requires a jury to

sift through disputed factual contentions, and to draw inferences therefrom . . .

summary judgment . . . in excessive force cases should be granted sparingly" (internal

quotation marks and citation omitted)).

Plaintiff argues that photographs of Bradley taken in a hospital emergency room

on the night of the shooting contradict his testimony that Benjamin attacked him and

that this inconsistency would allow a reasonable jury to disbelieve Bradley's account of

the events leading up to Benjamin's shooting.  Plaintiff has submitted three

photographs, each of which shows Bradley sitting up on a hospital bed, wearing an

undershirt, with his hospital robe pulled down off of one arm.  In one picture, Bradley is

lifting his chin up, showing his neck and primarily the left side of his face.  In another, he

is pulling his right sleeve up past his shoulder and showing his bent arm and elbow to the camera. The third picture shows Bradley's legs from the knees down; he is looking directly into the camera. The photographs (at least the copies submitted to the Court) appear to show some redness and scratches on Bradley's neck, an abrasion (or perhaps a slight laceration) above his left eye, and a small abrasion on his right bicep. Plaintiff characterizes the injuries visible in the photographs as "minor scratches, which appeared to be self-inflicted and some facial acne." Pl. Resp. to LR 56.1 St., Add'l Facts at 14 ¶ 26.

Bradley disputes plaintiff's characterization of the photographs, arguing that they instead "clearly show redness over Bradley's face, neck, arms, hands and legs, bruises around his eyes and a laceration on his forehead." Reply at 6. Bradley also argues that plaintiff has submitted no medical evidence, either from the hospital that treated Bradley or from an independent expert, to establish that the photographs are inconsistent with Bradley's testimony or that Bradley could have inflicted the injuries himself. Bradley has also submitted four additional photos of himself, two taken two days after the shooting, on April 28, 2006, and two taken on a different, unspecified day. Def. Reply, Ex. J. According to Bradley, these photos show that his face was badly bruised following the events of April 26, 2006, such that plaintiff has failed to raise a genuine issue of material fact through the hospital photos of Bradley. The photos appear to the Court arguably to show some redness on either side of Bradley's nose and, perhaps, an abrasion on his chin, but the copies the Court was provided have such poor coloration that it is difficult to draw the conclusion urged by Bradley.

In any event, the Court finds that the photographs of Bradley would permit a jury

9

reasonably to disbelieve his account of his struggle with Benjamin that immediately preceded the fatal shooting. Specifically, a jury reasonably could conclude, consistent with the evidence, that a person who had received the beating Bradley described in his testimony would have far more significant objective signs of injury than the photographs depict. A jury reaching that conclusion reasonably could, as a result, disbelieve Bradley's account of the events leading up to the shooting and find his shooting of Benjamin, who was unarmed, to have been objectively unreasonable in light of the facts and circumstances actually confronting him at the time. In sum, the Court concludes that plaintiff has shown that there is a genuine issue of fact as to Bradley's credibility, which is highly material to the determination of the reasonableness of his use of lethal force.

### 2. Qualified immunity (count 1)

Bradley alternatively contends that he is entitled to summary judgment on plaintiff's excessive force claim on the ground that he has qualified immunity from liability. Qualified immunity shields from liability public officials (including police officers) performing discretionary functions "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The Court conducts a two-part inquiry in analyzing the issue of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 196 (2001). At the threshold, the Court determines whether the facts, construed in the light most favorable to the plaintiff, would allow a reasonable finder of fact to determine that the officer's conduct violated a

constitutional right. *Id.* at 201; *Sallenger*, 473 F.3d at 739. If so, the Court next goes on to consider whether, at the time of the alleged violation, the constitutional right at issue was clearly established. *Id.*

The Court has already addressed the first inquiry and has determined that a reasonable jury could find that Bradley's use of lethal force against Benjamin on April 26, 2006 violated Benjamin's rights under the Fourth Amendment. Thus, to defeat Bradley's qualified immunity defense, plaintiff must either "point out a closely analogous case that established a right to be free from the type of force [Bradley] used on him" or establish that "the force was so plainly excessive that, as an objective matter, [Bradley] would have been on notice that [he was] violating the Fourth Amendment." *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008) (citing *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)).

Plaintiff cites *Garner* to support his argument that a police officer may not seize an unarmed, nondangerous suspect (which is how plaintiff characterizes Benjamin) by using deadly force. The Supreme Court held in *Garner* that an officer may use deadly force to prevent escape only if there is probable cause to believe that a suspect has committed a crime involving the infliction or threatened infliction of serious physical harm and if, when feasible, the officer has given the suspect some warning. 471 U.S. at 11-12. Although the second part of the qualified immunity test requires that the constitutional right be clearly established and specifically defined, "in an obvious case" the general standards set out in *Graham* and *Garner* can "'clearly establish' the answer, even without a body of relevant case law." *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) (citations omitted).

Bradley concedes that an officer "may not shoot an unarmed person who presents no threat to the officer," Def. Reply at 12, but argues that plaintiff has not offered any facts for the Court to credit his account. Although it is true that plaintiff has not provided—and could not provide—any eyewitness affidavits regarding the shooting, the Court has determined that plaintiff has presented evidence raising a genuine factual dispute whether Bradley's use of lethal force against Benjamin was reasonable. The only remaining question, therefore, is whether Bradley's use of lethal force was so plainly excessive that he should have been on notice that he was violating the Fourth Amendment by shooting Benjamin.

In this regard, the Court is again required to view the facts in the light most favorable to plaintiff. Viewed in that light, were a finder of fact to determine, as one reasonably could, that Bradley responded to a 911 call for a domestic disturbance, found Benjamin standing in the courtyard of the apartment complex, naked and unarmed; sprayed Benjamin with pepper spray; followed him into the bathroom, where Benjamin was washing pepper spray from his son's eyes; chased him into his bedroom; and shot him in the head after, perhaps, a struggle but without provocation sufficient to warrant deadly force—the fact finder reasonably could determine that Bradley's decision to use lethal force was an obvious case of a violation of Benjamin's clearly established rights as set out in *Graham* and *Garner*. Bradley is thus not entitled to summary judgment on the basis of qualified immunity.

3. ***Monell* claim against the Village (count 2)**

Plaintiff has also advanced a claim against the Village of Glen Ellyn resulting from its alleged failure to instruct, supervise, control, and discipline Bradley so that he

would refrain from using unjustifiable deadly force.  To avoid summary judgment on this

count, plaintiff must provide evidence from which a jury reasonably could find that an

official policy or custom of the Village or the Glen Ellyn police department caused the

deprivation of Benjamin's constitutional rights.  *See Monell v. Dept. of Soc. Servs.*, 436

U.S. 658, 694 (1978); *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602,

620 (7th Cir. 2001).  The Court construes plaintiff's *Monell* claim as a claim of failure to

train:  plaintiff contends that summary judgment on the *Monell* claim should be denied

because he has presented evidence that a domestic violence policy would have

allowed Benjamin's death to be averted, and his expert has focused on the Village's

failure to train its force.

Inadequate police training can serve as the basis for liability under section 1983

only when the failure "amounts to deliberate indifference to the rights of persons with

whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388

(1989).  "[T]o ensure that isolated instances of misconduct are not attributable to a

generally adequate policy or training program, [the Seventh Circuit] require[s] a high

degree of culpability on the part of the policymaker" as well as a demonstration by the

plaintiff that the failure to train caused the constitutional violation.  *Cornfield by Lewis v.*

*Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993).

To prove deliberate indifference, a plaintiff must show more than "simple or even

heightened negligence."  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397,

407 (1997).  The indifference must rise to the level of a municipal policy or custom,

which can arise in two circumstances:  1) "when, 'in light of the duties assigned to

specific officers or employees the need for more or different training is so obvious, and

13

the inadequacy so likely to result in the violation of constitutional rights,' that the

deficiency exhibits deliberate indifference on the part of municipal policymakers"; or 2)

"when a repeated pattern of constitutional violations makes 'the need for further training

. . . plainly obvious to the city policymakers.'" *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th

Cir. 2007) (quoting *City of Canton*, 489 U.S. at 390 & n.10).

Plaintiff offers no evidence of other instances of deadly force or even excessive

force violations by the Glen Ellyn Police Department.  Indeed, he makes no mention of

any such occurrences.  It therefore appears that he is proceeding under the first

method of proving deliberate indifference.

Plaintiff's *Monell* theory is, however, asserted rather vaguely.  Plaintiff offers no

direct support for his contention that the Village failed to train Bradley on the proper use

of deadly force.  His failure to train theory is best discerned, as defendants suggest,

through the opinions of retired Alabama police investigator William Gaut, plaintiff's

expert witness.  Gaut testified that the Village's failure to properly train officers and

dispatchers on how correctly to respond to a domestic violence complaint[2] resulted in

Bradley's decision to approach Benjamin alone, without waiting for back-up to arrive—a

decision that plaintiff contends led to Bradley's unjustified use of deadly force.  Gaut

testified that a domestic violence policy should contain an arrest procedural policy

directing an officer on how to respond, who should respond, and what to do during a

response.  Under such a policy, he says, two officers would have responded to the

---

[2]  Glen Ellyn Deputy Police Chief William Holmer testified that although the
Police Department follows the DuPage County domestic violence protocol, it does not
have a domestic violence policy of its own.

scene on July 26, 2006, rather than Bradley alone.  Gaut concluded that in all

likelihood, two officers would have been able to handcuff Benjamin successfully.

To prevail on an inadequate training claim, however, plaintiff must show more

than a probability that in this particular case, Benjamin would not have been killed if two

officers had responded to the scene pursuant to a domestic violence response policy.

Rather, he must show that the police training that Glen Ellyn provided its police officers

was "obviously deficient with respect to handling" domestic violence calls and that this

inadequacy was "so likely to result in a violation of a constitutional magnitude that a jury

could reasonably attribute to the municipality's policymakers deliberate indifference to

these training needs." *Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997).

Plaintiff has offered no evidence from which a reasonable jury could reach such

a conclusion.  It is undisputed that Benjamin's death was the first fatality in at least two

decades in Glen Ellyn.  There is nothing in the record to suggest that any Village

policymakers were aware of a need for training for the Glen Ellyn Police Department on

the particular aspect of domestic violence response procedure cited by Gaut, let alone

that they were "deliberately indifferent" to such a need.  *See id.*  A reasonable jury could

not conclude, based on this evidence, that the Village had "actual or constructive notice

that a particular omission [wa]s likely to result in constitutional violations."  *Id. at* 1344.

For this reason, plaintiff's failure to train claim fails.[3]  Because plaintiff did not argue, in

---

[3]  Gaut also testified at length about what he characterized "a pattern of failure to train," Pl. Ex. E, 61:24-25, a conclusion he reached based on the alleged failure of the Glen Ellyn Police Department and the Village to provide proper training on how to conduct background investigations and polygraph examinations.  Given that inadequate training can serve as the basis for liability only when it "amounts to deliberate

(continued...)

his response to defendants' motion for summary judgment, any other potential basis for

*Monell* liability on the part of the Village, the Court grants the Village's motion for

summary judgment on count two.

### 4.    Illinois Wrongful Death Act claim (count 5)

In count five, plaintiff brings a wrongful death claim against Bradley and the

Village.[4]   The Illinois Wrongful Death Act, 740 ILCS 180/1 & 2, provides a cause of

action for the benefit of a deceased person's next of kin to compensate them for their

losses.  To sustain his wrongful death claim, plaintiff must show Benjamin's death was

caused by the wrongful act, neglect, or default of Bradley and the Village.  *Id.*

Defendants advance two arguments as to why summary judgment should be

granted on this claim.  First, they argue that they are immune from liability under the

Illinois Tort Immunity Act, 745 ILCS 10/2-202, because there is no evidence that

Bradley or any other Glen Ellyn Police Department employee acted willfully or wantonly.

The Tort Immunity Act provides that a public employee executing or enforcing any law

can be held liable only if the act constitutes willful and wanton conduct.  *Id.*  Willful and

wanton conduct is "a course of action which shows an actual or deliberate intention to

---

[3](...continued)
indifference to the rights of persons with whom the police come into contact," *City of Canton*, 489 U.S. at 388, this testimony does not assist plaintiff.  The Police Department's shortfalls in training personnel on administering polygraphs and screening candidates are insufficient to allow a reasonable jury to conclude that an official policy or custom of the Village or the Department caused the alleged deprivation of Benjamin's constitutional rights.

[4]  Under Illinois law, a municipality may be liable on a theory of *respondeat superior* if its employee is found to be liable and not entitled to immunity.  *See Torres v. City of Chicago*, 123 F. Supp. 2d 1130, 1133 n.3 (N.D. Ill. 2000) (citing 745 ILCS 10/2-109).

cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property."  745 ILCS 10/1-210.

Defendants contend that Bradley's shooting was legally justifiable and that an officer's legally justified use of deadly force does not constitute willful and wanton conduct.  Under Illinois law, a police officer is authorized to use deadly force only in circumstances similar to those outlined in *Garner*.  *See* 720 ILCS 5/7-5.  Thus, an officer may use deadly force if he reasonably believes that it is necessary to prevent death or great bodily harm to himself or another.  *Id.*  He may also use it to prevent a suspect from escaping if the suspect has committed or attempted a felony involving the threatened or actual infliction of great bodily harm; is attempting to escape through use of a deadly weapon; or otherwise indicates that unless he is immediately arrested, he will "endanger human life or inflict great bodily harm."  *Id.*

Whether conduct is willful and wanton is typically an issue of fact for the jury. *See Urban v. Village of Lincolnshire*, 272 Ill. App. 3d 1087, 1094, 651 N.E.2d 683, 688 (1995).  As discussed earlier, plaintiff has shown that there is a genuine factual dispute regarding whether Bradley's account of the shooting is credible and thus whether his use of lethal force against Benjamin was reasonable under the circumstances.  Thus, contrary to defendants' contention, they have not shown that Bradley's conduct was justified as a matter of law.

Second, defendants argue that they have absolute immunity under the Tort Immunity Act, 745 ILCS 10/2-201, from any claim based on a deficient police policy or practice.  Section 2-201 states that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury

resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." *Id.* Defendants contend that, to the extent plaintiff claims that the lack of a domestic violence policy prohibiting Bradley from acting before backup arrived led to Benjamin's death, the Tort Immunity Act excuses from liability both Bradley and the Village.

As plaintiff's response to defendant's motion for summary judgment makes clear, however, the Wrongful Death Act claim is premised not on the Police Department's failure to maintain a domestic violence response policy, but rather on Bradley's fatal shooting itself. Because defendants do not argue that Bradley's actual shooting of Benjamin was an exercise of discretion or determination of policy, the Court need not address this argument further.

Defendants also contend that plaintiff's response does not address any of the arguments in defendants' motion for summary judgment that were directed to counts three to six and that plaintiff has thereby abandoned these claims. Plaintiff stated in his response that he was withdrawing counts three and four. As to counts five and six, however, defendants' assertion is factually incorrect. Paragraph D in plaintiff's response directly confronts defendants' argument that summary judgment is appropriate on count 5 and plaintiff's overall response addresses defendant's liability under count 6. Plaintiff has not forfeited those claims.

For these reasons, the Court denies defendants' motion for summary judgment on count two.[5]

_____

[5] There is no mention either in plaintiff's complaint or in the parties' briefs on the
(continued...)

## 5. Tort Immunity Act claim

Plaintiff alleges in count six that the Village should be required to pay any tort compensatory damage judgment for which it or an employee acting within the scope of his employment is liable. Defendants' only argument with regard to this claim is that if counts one through five of plaintiff's complaint fail, this claim in count six must fail as well. Because the Court has denied defendants' motion for summary judgment as to counts one and five, the Court denies summary judgment on count six as well.

## Conclusion

For the reasons stated above, the Court grants in part and denies in part defendants' motion for summary judgment [docket no. 41]. Summary judgment is granted in favor of defendants on Count two of plaintiff's complaint; Counts three and four are voluntarily dismissed with prejudice; and the "unknown police officers" are dismissed as a defendant. Defendants' motion is otherwise denied. Defendants' motion to file their reply *instanter* was previously granted and is therefore terminated [docket no. 62]. Counsel are directed to appear for a status hearing on July 22, 2008, at 9:30 a.m. for the purpose of setting a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 15, 2008

---

[5](...continued)
motion for summary judgment of the role any unknown officers may have played in Benjamin's death. Because it appears that plaintiff has chosen not to pursue his complaint against the unknown officers, the Court terminates them as a defendant.